(33 South. 51.)

No. 13,901.

NEW ORLEANS & N. E. R. CO. v. LOUISI-
ANA CONST. & IMP. CO.*

(May 26, 1902.)

VOLUNTARY PAYMENT—RECOVERY—EVIDENCE
—DURESS.

1. A voluntary payment of money under a claim of right asserted by the creditor, and with knowledge by the debtor of the facts, cannot, in general, be recovered back.

2. Where the parties were not on equal terms; where the payer had no choice; where the only alternative was to submit to an illegal exaction or discontinue business—these and other like circumstances evidencing pressure or duress under which money or other value is parted with, have never been regarded as embraced within the rule of voluntary acts within the meaning of the maxim "Volenti non fit injuria."

3. But where dispute arises and the debtor, who pays under protest, has at hand other means of immediate relief than by making the payment, his act is not one done under coercion, and his protest does not take the case out of the category of voluntary payment.

4. It is not duress to institute, or threaten to institute, civil suits, or take proceedings in court, or for a claimant to declare he intends to use the courts wherein to insist upon what he believes to be his legal rights.

5. If the party against whom the demand is made had full opportunity at the time to test the legality of the exaction he should do so.

(Syllabus by the Court.)

Appeal from civil district court, parish of Orleans; Thomas C. W. Ellis, Judge.

Action by the New Orleans & Northeastern Railroad Company against the Louisiana Construction & Improvement Company. Judgment for plaintiff, and defendant appeals. Reversed.

James R. Beckwith, for appellant. Harry H. Hall, for appellee.

BLANCHARD, J. Plaintiff company claims certain wharfage rights and privileges on the river front of the city of New Orleans. Their rights and privileges are predicated on an ordinance adopted by the common council in December 1881, and another adopted in April 1887, and on a contract, executed pursuant to said ordinances, by and between the mayor of the city and the company.

*Rehearing denied December 1, 1902.

It has been the custom of the city to farm out or lease its wharves and landings, and this is accomplished by offering the same for a term of years at public auction to the highest bidder.

In May, 1891, the wharves and landings of the city and their revenues (the old lease having expired), were again offered for lease for a period of ten years on the terms and conditions prescribed in certain city ordinances, and defendant company became the adjudicatee, and a contract evidencing the lease was entered into between it and the city.

The dispute between plaintiff and defendant out of which grew this litigation arose over the construction of the ordinances and the contracts referred to, and under which the disputants, respectively, claim.

An exception that the petition of the plaintiff does not set forth or disclose any lawful cause of action or right to recover having been tendered by defendant, the same was referred to the merits, and subsequently overruled.

From this judgment and from a decree sustaining the contentions of the plaintiff and awarding it the sum sued for, defendant appeals.

.The exception referred to raises serious preliminary issues against the action that must be disposed of before the ordinances and contracts upon which the respective rights of the parties litigant are predicated can be considered.

The petition sets forth, in substance, that the city of New Orleans did, in 1881, acting within its power and in furtherance of its charter purposes, grant to the plaintiff corporation the right to locate, construct, maintain and operate its railroads by steam power in and over certain streets and landings of the city, and to use the same.

That it (appellee) was given the right to occupy for its purposes that portion of the levee, batture and wharf beginning at Port street and extending a distance of 1,000 feet down the river to Montegut street and to erect and maintain thereon wharves, piles, tracks, stations, sheds and other structures as would be necessary and convenient to its business.

That the wharves it was thus to have the right to erect and use were to be constructed in such way as to be satisfactory to the city

and the same were to be kept in repair and lighted and policed by the company.

That the then existing wharves between Port and Montegut streets, which had been constructed by the city, and which were to be replaced by the new wharves to be erected by plaintiff, were, themselves—that is to say the old wharves—to be replaced (meaning removed to or rebuilt) at such point on the river front as the city should indicate.

That the company was to have certain parts of certain streets, which are mentioned, and an embankment along another street for a certain distance was to be constructed.

That no vessel was to be permitted to occupy or lay at the company's wharves, discharge or receive cargo thereat, without its consent, and all vessels lying at or using the wharves by consent of the company, and on business of the company, shall be exempt from the payment of levee or wharf dues to the city.

That any vessel lying at the company's wharves with its consent, but not on its business—not for the purpose of receiving or discharging freight or passengers to or from the company's railroad as a carrier—shall pay the usual wharfage dues to the city.

That the true meaning and import of the ordinance granting it the wharfage rights was that if the bulk or greater part of a vessel's cargo is destined to be carried over its (the plaintiff's) line of railroad, or if received from its railroad, such destination or receipt operated to exempt the vessel from wharfage dues while lying at the wharf for such purposes, although incidentally it may discharge on, or receive from the wharf, portions of its cargo, or some of its passengers not destined to be carried over, or not received from, petitioner's railroad.

That defendant company has no right to collect wharfage dues, under any circumstances, from vessels lying at petitioner's wharves, because said wharves were not constructed nor paid for by the defendant, nor included in the lease to it.

The petition then goes on to aver that in 1887, another ordinance was passed by the city relating to the wharfage rights and privileges of the plaintiff company and authorizing the mayor of the city to execute a contract with the company carrying out the grant, which was done, and that by virtue of said ordinance and contract petitioner constructed the wharves aforesaid at large cost to it and otherwise carried out the obligations imposed upon it, such as the paving and embankment heretofore referred to and the replacing or rebuilding elsewhere the wharves it found along the stretch of river front between Port and Montegut streets, of which wharves, thus reconstructed, the city and its lessees have had the use and benefit.

That it expended the large sums involved in the above constructions upon the faith that no levee or wharf dues should be exacted from vessels lying at or occupying its wharves on the business of petitioner as a common carrier.

That petitioner constructed tracks and sheds upon its wharves and the former form part of its railroad in operation between New Orleans and Meridian, Miss.

That its wharves and landings were not included in the contract entered into between the city of New Orleans and defendant company, by which the wharf rights of the city and the revenues arising therefrom were leased to defendant.

That, nevertheless, defendant company, without warrant of law, asserts its right to collect and has collected and is collecting wharf dues from vessels lying at petitioner's wharves and landings and using the same on its business.

That in order to hold its business and meet the competition of the Illinois Central Railroad Company, which guaranties the shippers of fruit over its lines free wharfage at its wharves, petitioner has been compelled to likewise guaranty all vessels using its wharves, for the purpose of discharging or receiving fruit to or from it, against wharfage dues.

That during the years 1895 and 1896, there landed at petitioner's wharves certain steamships or vessels, giving their names, dates of arrival, etc.

That the said vessels landed at, occupied and used petitioner's wharves (and no other wharf in the city) with its consent and solely on its business.

That, notwithstanding, defendant company illegally demanded wharf and levee dues from said vessels and collected the same during said years 1895 and 1896, to the amount of $21,447.24 in the aggregate.

That defendant persisted in its illegal acts

and collections, harassing the owners of said vessels by admiralty seizures and the menace thereof, refusing to make a test case of its asserted right to collect such wharfage dues, or to permit the plaintiff, or the owners of the vessels to deposit the alleged dues to abide the result of judicial investigation.

That under the guaranty aforesaid of exemption from wharfage dues which it (plaintiff company) gave to the vessels landing at its wharves, it paid, under protest, however, and with notification that it would sue to recover sums so paid, to defendant company the wharfage dues demanded of said vessels, amounting in the aggregate, at the time this suit was filed, to the sum sued for.

That it paid the said sums either to defendant directly or reimbursed the same to the owners or agents of the vessels so paying, taking for each payment from the vessels an assignment and subrogation of such rights as the owners had or might have by reason of said exaction and payment.

That petitioner was compelled to pay the said wharfage dues under duress and to prevent the destruction of its fruit trade, which, otherwise, would have been completely devested, to its great loss and detriment.

And that said vessels, had such payments not been made by petitioner, would have been so harassed by a multiplicity of suits that they would have abandoned petitioner's wharves to petitioner's great pecuniary loss.

The exhibit annexed to the petition shows 214 instances of exaction of wharfage dues from vessels using plaintiff's wharves during two years, 1895 and 1896, and the prayer of the petition is that plaintiff company recover back the money alleged to have been so extorted.

There is no averment that defendant company acted in bad faith in demanding wharf dues; nor that it did not believe it had full right to the dues so demanded from the vessels; nor that defendant knew its demand for dues was unfounded in right or law.

Taking the allegations of the petition as thus set forth, the question which the exception of no cause of action raises is whether the payments made by the plaintiff company, and which it seeks to recover back, are to be considered in law involuntary payments, made under such circumstances of duress and intimidation as entitled the payer to recover the same as in this action sought.

Since the exception was referred to the merits without prejudice, and other pleadings were filed and evidence taken on the trial on the merits, it is permissible and proper to look at the whole case as presented by the record the better to determine the question raised by the exception.

The answer of defendant denies that it ever had any dealings with the plaintiff in demanding or collecting wharfage dues on any of the vessels named in the exhibit to the petition; avers that plaintiff is not and never was the owner of any of said vessels; that the wharfage fees claimed were due and owing by the vessels themselves or their actual owners or charterers, and not by plaintiff; and that the same were secured by maritime lien on the vessels and not on any property of the plaintiff.

It denies that defendant company ever made any demands on plaintiff for such dues or threatened to seize any of its property in enforcement of the same; that the dues were demanded only from the real debtors—the vessels and their owners.

It avers that if it be true the plaintiff has meddled and provided the true debtors with money to pay the dues, it was a transaction which defendant was not a party to nor interested in, or affected by, and that such an act of generosity on part of plaintiff does not affect the rights of defendant nor give the plaintiff any greater legal rights than accrue to those who pay voluntarily the debts of others when not under any legal obligation so to do.

It is denied that during 1895 and 1896 the vessels named in the exhibit landed at the wharf described in plaintiff's petition solely on the business of plaintiff company for the purpose of receiving and discharging freight or passengers to or from its railroad.

On the contrary, it is averred that the vessels in question landed at the wharf for other and general wharf purposes, and, in discharging cargoes, landed freight, passengers and mails on said wharf not destined for plaintiff's railroad as a carrier, and, in receiving cargoes, loaded freight, passengers and mails from said wharf which had not been brought there by the railroad, nor had any connection with it in any manner.

Defendant further denied that it had refused the owners of vessels an opportunity to make a test case to establish any right claimed to freedom from wharf charges; that it does not comprehend how in law it could prevent such issue from being made if the owners of the vessels had so elected; that on refusal to pay wharfage dues defendant had libeled some of the vessels in admiralty for such dues and had recovered judgments for same in the United States district court for the Eastern district of Louisiana, which judgments on appeal to the United States circuit court of appeals had been affirmed.

The position of defendant is, it exercised no duress on plaintiff at all, and none on the vessels or their owners save and except that when its just legal demands for wharfage dues as lessee of the city were disputed it proceeded in good faith in a court of competent jurisdiction to collect the same by due process of law.

The record discloses that in 1894 defendant company took proceedings in admiralty against several of the vessels belonging to or chartered by the New Orleans. Belize, Royal Mail & Central American Steamship Company, Limited, which were the vessels that landed at plaintiff's wharf, libeling each vessel for and on account of wharfage fees alleged to be due it (defendant herein) under its contract with the city; that the owner of the vessels appeared and defended the suits, claiming the same exemption from wharfage exactions as is set up in the instant case; that the same contracts by and between the city and plaintiff herein, on the one hand, and by and between the city and defendant herein, on the other hand, as are set forth in the instant case, were set up in the cases in admiralty in the federal courts aforesaid; and that on the issue there raised as to the legal right of the Louisiana Construction & Improvement Company (defendant herein) to exact wharfage dues from vessels landing at the wharf claimed by the plaintiff, under circumstances similar to the instances for which the charges now sought to be recovered back were made, the right so to charge was affirmed, and the pretension of freedom from such dues, then (as now) set up, was rejected.

This decision was by Judge Parlange of the United States district court for the Eastern district of Louisiana and his judgment was on appeal affirmed by the United States circuit court of appeals. See 21 C. C. A. 364, 75 Fed. 309.

While the libels against the vessels referred to for wharfage dues, were pending in the admiralty court, the New Orleans, Belize, Royal Mail & Central American Steamship Company, Limited, the owner of the vessels, filed a bill of complaint in the circuit court of the United States for the Eastern district of Louisiana, against the Louisiana Construction & Improvement Company, wherein the ordinances of the city and the contract predicated thereon, under which the present plaintiff claims its wharf rights, were declared on as exempting the vessels of the complainant company from liability to the construction and improvement company—the city's wharf lessees—for wharfage dues because of landing at and making use of the present plaintiff's wharves.

The whole situation as to the wharves of the city, the right of the present plaintiff company to the use for wharfage purposes of that part of the river front from Port to Montegut streets, and the rights acquired and held by the present defendant company as lessees of the city's wharves and the revenues thereof, were set forth at length in the bill of complaint, and it was averred that the construction and improvement company (present defendant) had illegally claimed, usurped and exercised, and illegally continues to claim, usurp and exercise, the pretended right of receiving and collecting wharfage tolls and dues upon the vessels belonging to the complainant (naming the vessels) landing or mooring at the wharves between Port and Montegut streets.

It was further set forth that, so claiming illegally wharfage dues from the vessels of the complainant, the construction and improvement company (wharf lessees) had, upon the refusal of the vessels to pay wharfage dues, libeled and obtained admiralty process against them from the district court of the United States, sitting in admiralty, illegally asserting and claiming a maritime lien upon the vessels by reason of their having landed at the wharves between Port and Montegut streets.

It was represented that the wharf lessees

had already sought to collect in the past, and are seeking to collect in the future, from the complainant on account of such wharfage dues various and large amounts aggregating a sum largely exceeding $2,000.

The bill was one in equity and its prayer was for injunction restraining the wharf lessees from harassing or interfering with the complainant or its vessels, or exacting wharfage dues from them, by reason of landing at and discharging and receiving freight and passengers on and from the wharves between the streets mentioned above.

An order was made requiring the defendant in the bill to show cause why the injunction prayed for should not issue.

But the case went no further, for the solicitors of the complainant, later, filed a motion to discontinue the bill, and that order was made.

Following this discontinuance and while the suits in admiralty against the vessels were yet under advisement by Judge Parlange of the federal district court, the New Orleans & Northeastern Railroad Company (present plaintiff) gave written notice to the wharf lessees (present defendants) that, having been compelled, by reason of the action of other railroad companies, to guaranty free wharfage to vessels occupying or landing at its wharves between Port and Montegut streets on its business, it would pay the wharfage charges of such vessels during the pendency of the suit it is about to institute against them (the lessees). "These payments," the notice went on to state, "will be made under protest, and solely for the purpose of preventing the issuance of admiralty process against such vessels, and the said N. O. & N. E. R. R. Co. now protests that such charges as may be paid by it are not due, and that the right to demand the same does not exist; that your company is notified that the railroad company denies positively the right to collect any wharfage dues for such vessels, and that it will sue to recover the same back as soon as the court shall have decided its exemption or the exemption of the vessels so using its wharves, from such payments."

This notice is dated January 2, 1895. Judge Parlange's decision holding the vessels liable for wharfage dues was handed down 10 days later, and this judgment was affirmed by the United States circuit court of appeals in May, 1896.

In July, 1896, and again in February, 1897, the New Orleans & North Eastern Railroad Company renewed in writing its protest and the announcement of its determination to sue to recover back the payments it was making to carry out its guaranty of free wharfage to vessels landing at its wharves.

The greater part of the sum sued for was paid directly by plaintiff to defendant. A lesser part was in reimbursement of sums paid by the shipowners directly.

Defendant never looked upon plaintiff as the debtor of the wharfage dues; never regarded its protest; gave no receipts which recognized the protest. It looked to the vessels only for wharfage dues. Its bills were made out against the vessels. It mattered not to defendant who paid the bills so they were paid. Whatever subrogation there was, the same was a matter entirely between the vessel owners and plaintiff.

On this review of the situation the question recurs has plaintiff a cause of action?

It is elementary that a voluntary payment of money under a claim of right cannot, in general, be recovered back. The question narrows to what is in law a voluntary payment.

The distinction to be made between payments voluntary and payments under duress has been a fruitful theme of discussion in the courts.

Where the parties were not on equal terms; where the payer had no choice; where the only alternative was to submit to an illegal exaction or discontinue business—these and other like circumstances evidencing pressure or duress under which money or other value is parted with have never been regarded as embraced within the rule of voluntary acts within the meaning of the maxim "Volenti non fit injuria." Swift Co. v. U. S., 111 U. S. 28, 4 Sup. Ct. 244, 28 L. Ed. 341.

But where dispute arises and the debtor, who pays under protest, has at hand other means of immediate relief than by making the payment, his act is not one done under coercion and his protest does not take the case out of the category of voluntary payment. Radich v. Hutchins, 95 U. S. 210, 213, 24 L. Ed. 409.

Protest does not tend to prove duress or ille-

gality of the demand made upon the debtor. A written notice of protest is not evidence of any right asserted to attach to the protestant. It requires proof dehors the writing to establish such. See Peebles v. City of Pittsburg, 101 Pa. 304, 47 Am. Rep. 714; Harvey v. Bank, 119 Pa. 212, 13 Atl. 202.

Filing a written protest does not make a payment involuntary. Commissioners v. Walker, 8 Kan. 436; Union Pac. R. Co. v. Dodge Co. Com'rs, 98 U. S. 544, 25 L. Ed. 196.

It is not duress to institute or threaten to institute civil suits, or take proceedings in court, or for any person to declare that he intends to use the courts wherein to insist upon what he believes to be his legal rights. Morse v. Woodworth, 155 Mass. 233, 27 N. E. 1010, 29 N. E. 525; Snyder v. Braden, 58 Ind. 145; Buck v. Axt, 85 Ind. 512.

"If the violence used be only a legal constraint," declares Civ. Code art. 1856, "or the threats only of doing that which the party using them had a right to do, they shall not invalidate the contract. A just and legal imprisonment, or threats of any measure authorized by law and by the circumstances of the case, are of this description."

In Benson v. Monroe, 7 Cush. 125, 54 Am. Dec. 716, where a vessel was taken into custody for debt and where the facts and equities made out a strong case for the recovery back of the money (a large sum) paid under protest in order to release the vessel, the defense was voluntary payment by a person who was given a chance to have his day in court on the legality of the demand on which the attachment was based and did not use his opportunity to defend. This defense was sustained, the supreme court of Massachusetts saying:—

"The court deem this a plain case. It is an established rule of law that if a party, with a full knowledge of the facts, voluntarily pays a demand unjustly made on him and attempted to be enforced by legal proceedings, he cannot recover back the money, as paid by compulsion, unless there be fraud in the party enforcing the claim and a knowledge that the claim is unjust. And the case is not altered by the fact that the party, so paying, protests that he is not answerable and gives notice that he will bring an action to recover the money back. He has an opportunity, in the first instance, to contest the claim at law. He has, or may have, a day in court; he may plead and make proof that the claim on him is such as he is not bound to pay. * * * The party has an option whether to litigate the question, or submit to the demand and pay the money."

Numerous authorities support the doctrine of that case.

In the case at bar there was every opportunity to litigate the question raised in a court of competent jurisdiction at the very time it was first raised.

There were six or eight seizures under admiralty process of the vessels landing at plaintiff's wharf, on the demand of wharfage dues. These seizures were immediately released on bond furnished by the owners, who, thereupon, could have raised and did raise the question of the legality vel non of the exaction.

They had all the time they desired (their vessels being out of custody) to litigate to a finish the issues raised in the instant case.

Not satisfied with defending these several suits in admiralty against their vessels, the owners, as we have seen, brought a bill of complaint in equity in the circuit court of the United States sitting within sight of the wharf at which it is contended the illegal wharfage exactions were made, raising that very question anew, and then voluntarily abandoned the case.

The vessels involved in the proceedings above noted are the ones against which the wharfage dues now sought to be recovered back were exacted.

When they were invited into court, and when they, themselves, in another suit invited the defendant herein into court, to litigate the questions now raised, was the time to have wielded as a shield of defense the weapon that is now being used as an instrument of attack.

If, after the proceedings had in the admiralty court, and on the bill in equity in the federal circuit court, the owners of the vessels paid wharfage, it was a voluntary act by which they must abide, and if they are bound thereby, no less so is plaintiff, their assignee and subrogee.

But if it be said plaintiff was no party to the proceedings in the federal courts, and having been compelled to guaranty free wharfage at its wharf in order to retain its

business as carriers of fruit, is now entitled to litigate for itself the questions raised, the answer is that the time to have raised them was when the first vessel, landing at its wharf after its guaranty was given, was called upon for the wharfage dues.

Taking upon itself the defense of the vessels, how easy to have refused payment, and then when the vessel was libeled and seized in admiralty, to have bonded her and made the fight then and there for the exemption now asserted.

Or, to obviate repeated seizures of the vessels, to have sued out, in a court of competent jurisdiction, a writ of injunction to prevent the alleged illegal exaction of wharfage dues, and, through that proceeding and process, to have litigated at the inception the questions now raised. 49 La. Ann. 51, 21 South. 171.

We fail to perceive in the case at bar any inequality of footing between the parties.

In Preston v. City of Boston, 12 Pick. 7, 13, the court said:—

"A party who has paid voluntarily under a claim of right shall not afterwards recover back the money although he protested at the time against his liability. The reason of this is obvious. The party making the demand may have the means of proving it, which he may afterwards lose; and because another course would put him into the power of the other party to choose his own time and opportunity for commencing a suit." Citing Brisbane v. Dacres, 5 Taunt. 143.

In that case, too, the question of what constituted duress was discussed, and it was said that threat of distress for rent is not such duress, because the party may replevy the goods distrained and try the question of liability at law. It was said, also, that threat of legal process is not duress, for the party may plead and make proof and show he is not liable.

These observations are apposite here.

In Silliman v. U. S., 101 U. S. 465, 470, 25 L. Ed. 987, the question of the courts being open at the time when the dispute first arose, and the duty of the debtor to invoke seasonably their aid, and not doing so but paying under protest, and then suing to recover back, claiming duress, was discussed and settled adversely to the pretensions of plaintiff

herein. See, also, U. S. v. Wilson, 168 U. S. 273–277, 18 Sup. Ct. 85, 42 L. Ed. 464, and Brumagim v. Tillinghast, 18 Cal. 265, 79 Am. Dec. 176.

De La Cuesta v. Insurance Co. (Pa.) reported in 20 Atl. 505, 9 L. R. A. 631, is an elaborately considered case. The controversy was between a shareholder and the corporation. The plaintiff, contending he had been compelled to submit under protest to unlawful exactions of the corporation under duress, rendering his act involuntary, had sued to recall money so paid. The court held that the party complaining could have submitted the legality of the demand of the corporation to the courts and have had his rights determined on proper issue; that payment, under the conditions alleged by the plaintiff, was voluntary, and there could be no recovery of the money.

In that case the supreme court of Pennsylvania said:—

"There is no principle of law better settled than that money voluntarily paid with a knowledge of the facts cannot be recovered back. * * * If, in every instance in which a man is in doubt as to which is the safe course to pursue, he can pay under protest and then sue to recover back, it is difficult to see where litigation is to end. The law, therefore, wisely holds that a voluntary payment cannot be recovered back."

In Mays v. City of Cincinnati, 1 Ohio St. 268, it was said:—

"The reason of the rule and its propriety are quite obvious when applied to a case of payment upon a mere demand of money, unaccompanied with any power or authority to enforce such demand, except by suit at law. In such case, if the party would resist an unjust demand, he must do so at the threshold. The parties treat with each other upon equal terms, and if litigation is intended by the party of whom the money is demanded, it should precede payment. * * * When he [the debtor] can only be reached by a proceeding at law, he is bound to make his defense in the first instance, and, he cannot postpone the litigation by paying the demand in silence and afterwards suing to recover back." See, also, U. S. v. Edmondston, 181 U. S. 500, 21 Sup. Ct. 718, 45 L. Ed. 971; Union Pac. R. Co. v. Dodge Co.

Com'rs, 98 U. S. 544, 25 L. Ed. 196; and Fuselier v. St. Landry Parish, 107 La. 221, 31 South. 678.

On both reason and authority we must hold that giving the petition of plaintiff and the case as developed under it the most liberal construction, no right of action exists in law to recover the sum sued for.

It is virtually calling the defendant into court to try 214 cases (that being the number of wharfage exactions from vessels landing at plaintiff's wharf and going to make up the sum demanded) against different unnamed shipowners, after the ships have probably changed owners, or both shipowners and witnesses have left the jurisdiction or have forgotten the details of the facts involved in each of the separate issues.

It is, therefore, ordered, adjudged and decreed that the judgment appealed from be avoided and reversed, and it is now adjudged and decreed that the exception of no cause or right of action filed by defendant be sustained and this suit dismissed at the cost of plaintiff in both courts.